UNITED STATES of America,
Appellee,

v.

Jason COX (a/k/a "JC") and Clinton Cox, Defendants–Appellants,

Willie Grant, Defendant.

Docket Nos. 01–1299, 01–1501.

United States Court of Appeals,
Second Circuit.

Argued: Dec. 2, 2002.

Decided: March 19, 2003.

Mark Diamond, New York, NY, for Defendant–Appellant Jason Cox.

Barry M. Fallick, Rochman Platzer Fallick & Sternheim, LLP, New York, NY, for Defendant–Appellant Clinton Cox.

James J. Finnerty, Assistant United States Attorney for the District of Connecticut, Bridgeport, CT (John A. Danaher III, United States Attorney, and Jeffrey A. Meyer, Assistant United States Attorney, on the brief), for Appellee.

Before: VAN GRAAFEILAND, CARDAMONE, JACOBS, Circuit Judges.

JACOBS, Circuit Judge.

Defendants Jason and Clinton Cox challenge their convictions and sentences for numerous drug and gun crimes, following a jury trial in the United States District Court for the District of Connecticut (Nevas, *J.*). This opinion considers (a) Jason

Cox's argument that his acceptance of a gun as collateral for the purchase price of drugs did not constitute "use" of the gun under 18 U.S.C. § 924(c)(1), and (b) the argument by both defendants that the district court mishandled an allegation of juror misconduct. The defendants' remaining claims are considered and rejected in a summary order issued concurrently with this opinion. In sum, we affirm the judgments of conviction and sentences.

## BACKGROUND

Brothers Jason and Clinton Cox began selling crack cocaine in and around Bridgeport, Connecticut in 1995. By 1999, they were dealing throughout the Bridgeport area and as far away as South Carolina. Other individuals, often crack addicts, were recruited to help them purchase cocaine and guns, process cocaine into crack, rent and drive cars, and make sales. Their employees included Willie Grant, Thomas Marazita, and Robert Davis.

On several occasions in the period April to June 1998, undercover Connecticut police officers paged Jason Cox to arrange delivery of crack. Several of these transactions were recorded on audio and videotapes. On February 9, 2000, Thomas Marazita bought $50 worth of crack from Jason Cox in a controlled purchase. The police also recorded a February 10, 2000 phone conversation in which Jason Cox told Marazita to purchase crack from Grant and discussed guns with him.

On April 4, 2000, a federal grand jury in Connecticut indicted Willie Grant and the Cox brothers on various drug and gun charges. After Grant pleaded guilty, the grand jury returned a superseding indictment charging Jason and Clinton Cox with twenty counts of drug and gun offenses under 21 U.S.C. §§ 846 & 841 and 18 U.S.C. §§ 922 & 924. The district court granted a motion by the government to sever and ultimately dismiss felon-in-possession counts brought under 18 U.S.C. § 922(g)(1), and a motion by the government to dismiss one count of possession with intent to distribute.

At a jury trial on the remaining counts, conducted January 16 through January 23, 2001, the government offered, among other things, the testimony of (i) Grant, Marazita, and Davis, all of whom had pleaded guilty and testified pursuant to cooperation agreements; (ii) undercover officers who purchased crack from Jason Cox in 1998 and 2000; and (iii) officers who recovered 397 grams of crack from a rental car in which the Coxes were passengers. The jury convicted on all counts.

Post-verdict, Jason Cox challenged the sufficiency of evidence as to one count of possession with intent to distribute and one count of using a firearm. In an unpublished order, the district court ruled that "the government's evidence that the offense charged in count 13 occurred in the summer of 1998 does not amount to an improper material variance from the 'on or about June 20, 1998' date charged in the superseding indictment." (Ruling on Motion for Judgment of Acquittal, dated May 14, 2001, at 5.)

On May 17, 2001, Jason Cox was sentenced to 420 months in prison, ten years of supervised release, and a $900 special assessment. On September 12, 2001, Clinton Cox was sentenced to 540 months in prison, ten years of supervised release, and a $700 special assessment. Defendants filed timely notices of appeal.

## DISCUSSION

The Coxes challenge their convictions and sentences on numerous grounds, none of which warrants reversal or vacatur. While we reject most of their claims in a summary order filed today, two of their

claims raise issues that merit discussion in this published opinion.

## I. "Using" or "Carrying" a Firearm Under 18 U.S.C. § 924(c)(1)

Count Fourteen of the superseding indictment against Jason Cox alleged that, "[o]n or about June 20, 1998 ... [he] did knowingly use and carry a firearm ... during and in relation to a drug trafficking crime ... in violation of [18 U.S.C. § 924(c)(1)]." (Superseding Indictment, dated Aug. 2, 2000, at 5–6.) In a *pro se* brief submitted with the Court's permission, Cox argues that his taking of a gun as collateral for the purchase price of drugs did not constitute "use" or "carrying" of a gun within the prohibition of 18 U.S.C. § 924(c)(1). We disagree.

### A. Relevant Facts

The evidence at trial demonstrated that Jason Cox accepted a gun from Thomas Marazita as collateral for the purchase price of drugs on or about June 20, 1998.[1] On direct examination, Marazita testified as follows:

Q. Did Jason Cox ever ask you to obtain a gun for him?

A. Yes.

Q. And when, approximately?

A. Sometime in '97, '98.

Q. And what type of gun? Did you ever give him a gun?

A. Yes, I did.

Q. What type of gun?

A. A .357 magnum.

Q. Do you recall when you gave him that gun?

A. Sometime in the summer of '98.

Q. Did you ever pawn that gun?

A. Yes, I did.

Q. And where did you pawn the gun?

A. I pawned it at Joe Davis Pawn Shop in Bridgeport.

Q. And did you repurchase the gun?

A. Yes, I did.

Q. And when you repurchased the gun from Joe Davis, did you have to fill out any forms?

A. The standard transaction, transaction record.

Q. I show you what's marked into evidence as Government's 26 and ask if you recognize that.

A. Yes, I do.

Q. Is that your signature on it?

A. Yes, it is.

Q. Does that reflect you re-pawned the gun?

A. Yes.

Q. And what type of gun did you re-pawn?

A. That's a Sturm Ruger speed-six. It's a revolver, .357 magnum.

Q. And when did you re-pawn it?

A. Well, I purchased it, I bought it back in June, June 19th of '98.

Q. When did you give it to Mr. Jason Cox; do you recall?

A. Sometime after that date.

Q. Did you ever pawn that gun again?

A. No.

Q. After you gave it to Mr. Jason Cox, did you ever see that gun again?

A. No.

Q. Did you receive anything in exchange for giving him that gun?

A. Yes.

Q. What did you receive?

---

1. Cox argues that there was no evidence sufficient to establish that the alleged crimes occurred on the date charged in the indictment, but we reject that claim in the summary order published concurrently with this opinion.

A. Crack cocaine.

(Tr. of Jury Trial, dated Jan. 17, 2001, at 90–92.) On redirect, Marazita testified further:

Q. Do you recall the last time you bought the gun from Joe Davis?

A. Yes.

Q. When was that?

A. In July of '98.

Q. After you bought the gun from Joe Davis then, what did you do with it?

A. Eventually, I turned it over to Jason.

Q. In exchange for what?

A. For crack. Well, the dollar equivalent of crack.... I would contact Jason. I would say give me a dollar equivalent, give me 25 or 50 dollars worth of crack, I'll pay you tomorrow.... I was basically putting collateral up for the money that I owed him. So I would give him my gun. When I paid him the money I owed him for the drugs that I took, he would give me back the gun.

(Tr. of Jury Trial, dated Jan. 18, 2001, at 127–28.) To corroborate Marazita's account, the government introduced the pawn shop transaction records and the recording of a February 10, 2000 phone call in which Marazita asked Cox about the gun and Cox answered that he no longer had it.

**B. Standard of Review**

■ The issue of whether Jason Cox "used" or "carried" the firearm within the meaning of 18 U.S.C. § 924(c)(1) was not raised at trial. Indeed, trial counsel for Jason Cox acquiesced in a jury instruction that "[a]n individual who exchanges a controlled substance for a firearm, uses the firearm during and in relation to a drug trafficking crime." (Tr. of Jury Instructions, at 56–57, 63.) The § 924(c)(1) argument has been raised for the first time in

Jason Cox's *pro se* brief on appeal. "Generally, a party's failure to object to a jury instruction will preclude appellate review of the instruction." *See Johnson v. New York Hosp.,* 96 F.3d 33, 34 (2d Cir.1996); *see also* Fed.R.Crim.P. 30.

We therefore consider only whether there has been plain error, *i.e.,* (1) error (2) that is plain, (3) that affects substantial rights, and (4) that affects seriously the fairness, integrity, or public reputation of judicial proceedings. *See Johnson v. United States,* 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997); *United States v. Olano,* 507 U.S. 725, 732, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993); Fed. R.Crim.P. 52(b).

**C. Analysis**

Finding no error in the conviction under 18 U.S.C. § 924(c)(1), we need go no further than the first step of plain error analysis. At the time of the offense charged in the superseding indictment— "on or about June 20, 1998"—Section 924(c)(1) provided in pertinent part as follows:

Whoever, during and in relation to any crime of violence or drug trafficking crime ... for which he may be prosecuted in a court of the United States, uses or carries a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime, be sentenced to imprisonment for five years

. . . .

18 U.S.C. § 924(c)(1) (1996) (amended 1998). The government therefore had to prove that Jason Cox (1) used or carried a firearm, (2) did so knowingly, and (3) did so during and in relation to a drug trafficking offense. *See United States v. Desena,* 287 F.3d 170, 180 (2d Cir.2002). The third element is satisfied by Cox's conviction on Count 13 of the superseding indictment for possession with intent to distribute cocaine

base in violation of 21 U.S.C. §§ 841(a)(1) and 841(b)(1)(C). *See* 18 U.S.C. § 924(c)(2). Cox does not contest the second element. The issue here is whether Cox "carried" or "used" a gun during and in relation to his drug trafficking offense by accepting the gun as collateral for the price of drugs.

### 1. "Carrying" a Firearm

The phrase "carries a firearm" in 18 U.S.C. § 924(c)(1) includes "carrying of firearms on the person" and "knowingly possess[ing] and convey[ing] firearms in a vehicle, including in the locked glove compartment or trunk of a car, which the person accompanies." *Muscarello v. United States*, 524 U.S. 125, 126–27, 118 S.Ct. 1911, 141 L.Ed.2d 111 (1998). "In this Circuit, the 'carry' prong is satisfied if the evidence establishes that, during and in relation to the underlying crime, the defendant either (1) had physical possession of the firearm, or (2) moved the firearm from one place to another." *United States v. Persico*, 164 F.3d 796, 802 (2d Cir.1999); *see also Desena*, 287 F.3d at 180. "[A] firearm can be carried without being used, *e.g.*, when an offender keeps a gun hidden in his clothing throughout a drug transaction." *Bailey v. United States*, 516 U.S. 137, 146, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995).

The government argues that "carrying" is a viable theory for application of Section 924(c)(1) in this case, but this may be an afterthought. The government proffered no evidence that Marazita handed the gun to Cox or otherwise placed it on his person or in his physical control, or that Cox moved the gun from one place to another, by car or by any other means. To affirm this conviction based on the "carries" prong of Section 924(c)(1) would tax even the deferential standard of review we apply to sufficiency of evidence challenges. *See United States v. Reyes*, 157 F.3d 949,

955 (2d Cir.1998) (noting that we "view the evidence in the light most favorable to the government, . . . construe all permissible inferences in its favor, [and] resolve all issues of credibility in favor of the jury's verdict") (citations, alterations, and emphasis omitted).

■ In any event, we need not decide whether Cox "carried" the firearm. Where, as here, the indictment charged the defendant with "us[ing] and carry[ing] a firearm," the defendant may be convicted if he *"either* used or carried a firearm." *United States v. Giraldo*, 80 F.3d 667, 674 (2d Cir.1996) (emphasis added), *abrogated on other grounds by Muscarello*, 524 U.S. at 138, 118 S.Ct. 1911; *see also Persico*, 164 F.3d at 803. Cox's conviction is affirmed on the holding (reached below) that he "used" the gun as collateral for the purchase price of the drugs he sold to Marazita.

### 2. "Using" a Firearm

The statute in question does not define "use" of a firearm. *See* 18 U.S.C. § 924(c); *Smith v. United States*, 508 U.S. 223, 228, 113 S.Ct. 2050, 124 L.Ed.2d 138 (1993). In its original wording, Section 924(c)(1) applied to defendants who "use[ ] a firearm to commit any felony." *Bailey v. United States*, 516 U.S. 137, 147, 116 S.Ct. 501, 133 L.Ed.2d 472 (1995) (quoting 18 U.S.C. § 924(c)(1) (1968)). A 1984 amendment "altered the scope of predicate offenses . . . [and] substituted 'during and in relation to' the predicate crimes for the earlier provisions linking the firearm to the predicate crimes." *Id.* The Supreme Court has determined that the statute, as amended, "employed 'use' expansively, to cover both use as a weapon and use as an item of barter." *Id.* at 148, 116 S.Ct. 501 (citing *Smith*, 508 U.S. at 236, 113 S.Ct. 2050).

In *Smith,* which predated *Bailey,* the Supreme Court held that "a criminal who trades his firearm for drugs 'uses' it during and in relation to a drug trafficking offense within the meaning of § 924(c)(1)." 508 U.S. at 241, 113 S.Ct. 2050. In *Bailey,* the Court limited the meaning of "use" by holding that it "must connote more than mere possession of a firearm by a person who commits a drug offense," 516 U.S. at 143, 116 S.Ct. 501, and "requires evidence sufficient to show an *active employment* of the firearm by the defendant, a use that makes the firearm an operative factor in relation to the predicate offense." *Id.* (emphasis in original). *Bailey* expressly preserved *Smith,* however, since "it was clear that the defendant [in *Smith* ] had 'used' the gun" by "bartering" with it. *Bailey,* 516 U.S. at 148, 116 S.Ct. 501. The Supreme Court explained that "[t]he active-employment understanding of 'use' certainly includes brandishing, displaying, bartering, striking with, and, most obviously, firing or attempting to fire a firearm." *Id.* (emphasis added).

■ After *Smith* and *Bailey,* it is settled that one who *tenders* a firearm as barter for drugs is "using" it within the meaning of Section 924(c)(1). It is thus settled that the .357 handgun at issue in this case was "used" by Marazita during and in relation to a drug trafficking offense when he bartered with it to obtain drugs. The quite distinct question presented here is whether the gun was "used" *by Jason Cox* during and in relation to a drug trafficking offense when he *received* it from Marazita—the obverse of the barter transaction at issue in *Smith.*

■ The circuits are divided on the applicability of Section 924(c) to the receipt of a gun in a guns-for-drugs trade. That split is detailed in the margin.[2] This Circuit has not taken up the question, and we

---

2. The Third, Fifth, Eighth, and Ninth Circuits hold that taking a gun for drugs constitutes "use" of a firearm under 18 U.S.C. § 924(c)(1). *See United States v. Sumler,* 294 F.3d 579, 580 (3d Cir.2002) (upholding conviction because "bartering illegal drugs for a gun constitutes use"), *cert. denied,* —— U.S. ——, 123 S.Ct. 1257, 154 L.Ed.2d 1032 (2003); *United States v. Ulloa,* 94 F.3d 949, 956 (5th Cir.1996); *United States v. Cannon,* 88 F.3d 1495, 1509 (8th Cir.1996) (holding that distinction between "trading a gun for drugs" and "trading drugs for a gun is "a distinction without a difference"); *United States v. Ramirez–Rangel,* 103 F.3d 1501, 1506 (9th Cir.1997) (applying *Smith* rule that "[t]here is no question that bartering a firearm for drugs constitutes 'use' of the weapon" to defendants who sold drugs for guns, without acknowledging post-*Bailey* circuit split).

Ranged on the other side are the Sixth, Seventh, and District of Columbia Circuits. *See United States v. Stewart,* 246 F.3d 728, 731 (D.C.Cir.2001) ("[A] person who receives a gun in a trade for drugs has not used the gun in violation of § 924(c)."); *United States v. Warwick,* 167 F.3d 965, 975–76 (6th Cir.

1999); *United States v. Westmoreland,* 122 F.3d 431, 435 (7th Cir.1997). The Fourth Circuit has not considered the issue since the Supreme Court decided *Bailey. Cf. United States v. Harris,* 39 F.3d 1262, 1269–70 (4th Cir.1994) (holding, before *Bailey,* that defendant who gave crack to another person in exchange for obtaining a shotgun with money provided by defendant had "used" shotgun under 18 U.S.C. § 924(c)(1)).

This particular circuit split may dissipate without resolution. After the Supreme Court held that "use" requires active employment rather than mere possession, *see Bailey,* 516 U.S. at 143, 116 S.Ct. 501, Congress amended § 924(c) to include expressly a person who, "in furtherance of any such crime, *possesses* a firearm." Criminal Use of Guns, Pub.L. 105–386, sec. 1, 112 Stat. 3469 (1998) (emphasis added); *see also United States v. Lawrence,* 308 F.3d 623, 629 (6th Cir.2002) (describing evolution of § 924(c)); *United States v. Mackey,* 265 F.3d 457, 461–62 (6th Cir.2001) (same), *cert. denied,* 534 U.S. 1097, 122 S.Ct. 849, 151 L.Ed.2d 726 (2002). For defendants charged under § 924(c) after this amendment, trading drugs for a gun will probably result in such possession.

need not do so now because this case can be decided on a basis that distinguishes it from the scenario that has split the circuits: Cox took the gun *as collateral* for the cash price of drugs, not in barter of one commodity for another. Marazita testified that he gave Jason Cox his gun in exchange for "the dollar equivalent of crack," explaining:

> I would say give me . . . 25 or 50 dollars worth of crack, I'll pay you tomorrow. . . . I was basically putting collateral up for the money that I owed him. So I would give him my gun. When I paid him the money I owed him for the drugs that I took, he would give me back the gun.

(Tr. of Jury Trial, dated Jan. 18, 2001, at 128.) This scenario appears to be unique in the case law.[3]

"The language of § 924(c)(1), supported by its history and context, compels the conclusion that Congress intended 'use' in the active sense of 'to avail oneself of.'" *Bailey*, 516 U.S. at 150, 116 S.Ct. 501. Jason Cox, having sold drugs for cash to a buyer who lacked ready money (and whose obligation could not be enforced at law), took the buyer's gun as collateral to secure future payment. Jason Cox thus used the gun as leverage or security to facilitate a future transaction in which he would realize the value of the drugs by relinquishing the gun for cash (or other consideration) to the buyer (or someone else).[4] While it appears that Marazita never paid the cash he owed to Jason Cox—Cox told him in a February 2000 phone call that he had disposed of the gun in some other way—Cox nonetheless used the gun to close the drug transaction by selling or otherwise disposing of it to discharge Marazita's debt. This conclusion is reinforced by the significant role guns play in the drug trade.[5] Thus, the circumstances establish that Cox "used" the firearm during and in relation to a drug trafficking offense, in violation of 18 U.S.C. § 924(c)(1).

## II. Juror Misconduct

Jason and Clinton Cox both challenge the district court's handling of a juror misconduct allegation and its denial of their motion for a mistrial.

3. The government cites *United States v. DeJesus*, 219 F.3d 117, 122 (2d Cir.2000) (per curiam), for the proposition that a defendant's receipt of a gun as collateral for a drug debt establishes his possession of the gun for purposes of the Sentencing Guidelines' safety valve provision, U.S.S.G. § 5C1.2. (*See* Letter from Jeffrey A. Meyer, dated Oct. 28, 2002.) The issue in *DeJesus* was whether the defendant could assert ineffective assistance for his counsel's failure to pursue a sentence reduction under § 5C1.2. This Court held that he could not because he had admitted that "he received a gun as collateral for a drug debt." 219 F.3d at 122. That holding is irrelevant to the present case, however, because the sentencing safety valve applies when a defendant did not "possess" a firearm. U.S.S.G. § 5C1.2(a)(2). As noted, "mere possession" is neither necessary nor sufficient to establish "use" under § 924(c)(1). *Bailey*, 516 U.S. at 143, 116 S.Ct. 501.

4. While there is no evidence Cox handled the gun himself, that omission is immaterial for purposes of this "use" analysis. As the Supreme Court noted in *Bailey*, "a firearm can be used without being carried, *e.g.*, when an offender has a gun on display during a transaction, or barters with a firearm without handling it." 516 U.S. at 146, 116 S.Ct. 501 (emphasis in original).

5. *See, e.g., United States v. Crespo*, 834 F.2d 267, 271 (2d Cir.1987) ("We often have taken judicial notice that, to substantial dealers in narcotics, firearms are as much tools of the trade as are the commonly recognized articles of narcotics paraphernalia."); *United States v. Wiener*, 534 F.2d 15, 18 (2d Cir.1976) ("Experience on the trial and appellate benches has taught that substantial dealers in narcotics keep firearms on their premises as tools of the trade almost to the same extent as they keep scales, glassine bags, cutting equipment and other narcotics equipment.").

## A. Relevant Facts

On a Friday midway through trial, the government informed the judge about a conversation that had transpired that day between a legal secretary employed in the United States Attorney's office and a juror smoking a cigarette outside the courthouse. The secretary's account allowed the inference that one or more jurors had expressed the view that there should be a conviction. Defense counsel moved for a mistrial.

After questioning counsel to determine what happened and how the parties thought he should proceed, Judge Nevas admonished the jury "not to discuss this case with anyone ... and by anyone, I mean anyone." (Tr. of Jury Trial, dated Jan. 19, 2001, at 47.) He also reminded the jury "not to make any determinations until you have heard all the evidence and you have heard the instructions on the law, and you have heard the closing arguments by the lawyers." (*Id.* at 48.) The court then excused the jurors for the evening and scheduled a hearing for the following Monday morning to determine if there had been juror misconduct.

At the Monday hearing, the court questioned the legal secretary. Noting that he saw "no need to swear her," Judge Nevas asked her what had happened. (Tr. of Jury Trial, dated Jan. 22, 2001, at 3.) The secretary recounted that, during a break in the proceedings, she had been smoking outside next to a juror who told her that she was bored and tired, and who told her that the juror next to her poked her to keep her awake because the jurors wanted a conviction. Her account essentially corresponded to what the government had told the court the previous Friday.

Judge Nevas then proceeded to question the sleepy juror ("Juror A") and the juror who reportedly poked her ("Juror B"). After noting his discretion to conduct the hearing as he saw fit, Judge Nevas accepted the government's recommendation that he examine the two jurors *in camera* in a conference room, with counsel but not the defendants present.

Juror A recalled telling the secretary that she was bored by the trial, but denied discussing the case with other jurors or having preconceived views about the verdict. At the urging of defense counsel, the court examined Juror B, who also denied knowledge of any discussion among the jurors concerning the merits of the case. She told the court that she had reminded Juror A to stay awake, not because she wanted to ensure a conviction, but rather because she was embarrassed for Juror A.

Based on his inquiries, Judge Nevas concluded:

> [T]hey've clearly indicated that there have been no such conversations, no such discussions, and that they are willing and able to follow my instructions .... I have very broad discretion and I am going to exercise that discretion and not disqualify either of these women or discharge this jury[;] and we'[ll] resume with the evidence.

(Tr. of Chambers Hearing, dated Jan. 22, 2001, at 13–14.) The judge declined to question each of the remaining jurors individually and denied defense counsel's motion for a mistrial, noting the need to "walk a fine line" so that a problem was not created where none then existed. (*Id.* at 15–16.)

When Judge Nevas took the bench, he briefly questioned the jury as a group. After reminding them of their duty to engage in no premature deliberations, the court asked "whether there have been any such conversations or discussions in the jury room, informally, that anyone is aware of." (Tr. of Jury Trial, dated Jan. 22, 2001, at 14.) The court concluded

"from the lack of response that there have not been any such discussions." (*Id.*) The court then repeated its instruction to keep an open mind.

Later that day, outside of the jury's presence, Judge Nevas stated again that he had "determined as the result of [his] questioning of both those jurors, that there had been no discussions as between the two of them, nor had there been any . . . discussions within the jury itself regarding this case or what might be considered to be deliberations." (*Id.* at 53.) He concluded that no further inquiry was required, and that "the defendants have not been prejudiced." (*Id.* at 54.) The trial resumed.

### B. Standard of Review

■ This Court "review[s] a trial judge's handling of juror misconduct for abuse of discretion." *United States v. Abrams,* 137 F.3d 704, 708 (2d. Cir.1998) (per curiam); *see also United States v. Diaz,* 176 F.3d 52, 78 (2d Cir.1999); *United States v. Panebianco,* 543 F.2d 447, 457 (2d Cir.1976) (grounding this standard of review in the trial judge's "continuous observation of the jury in court").

### C. Analysis

■ "It is a generally accepted principle of trial administration that jurors must not engage in discussions of a case before they have heard both the evidence and the court's legal instructions and have begun formally deliberating as a collective body." *United States v. Resko,* 3 F.3d 684, 688 (3d Cir.1993). Courts usually cast this principle in terms of the Sixth Amendment right to jury trial. *See, e.g., United States v. Bertoli,* 40 F.3d 1384, 1393 (3d Cir.1994) ("Premature deliberations present a number of dangers, all in some manner affecting or touching upon the criminal defendant's Sixth Amendment right to a fair and impartial jury trial."); *see also* U.S. Const. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury."). Where the district court instructs a jury to refrain from premature deliberation, as Judge Nevas did here (*see* Tr. of Jury Trial, dated Jan. 16, 2001, at 121, 138–39), and the jury nonetheless discusses the case before the close of trial, that premature deliberation may constitute juror misconduct. *Cf. Abrams,* 137 F.3d at 708 ("[B]ecause the district court did not initially give an instruction on intra-juror discussions, any such discussions among the jurors did not constitute juror misconduct.").

■ A district court's investigation of juror misconduct or bias is a "delicate and complex task." *Id.; see also United States v. Thomas,* 116 F.3d 606, 618–20 (2d Cir. 1997). "The court has broad flexibility in such matters, especially when the alleged prejudice results from statements made by the jurors themselves, and not from media publicity or other outside influences." *United States v. Thai,* 29 F.3d 785, 803 (2d Cir.1994) (citation and internal quotation marks omitted); *see also Bertoli,* 40 F.3d at 1394 ("[I]ntra-jury communications pose a less serious threat to a defendant's right to an impartial trial than do extra-jury influences, and therefore district courts are entitled to even greater deference in their responses to them than in responses to outside influences."). A mistrial or other remedial measure is required only if juror misconduct and actual prejudice are found. *See Abrams,* 137 F.3d at 709 (" '[P]rejudice is generally the touchstone of entitlement to a new trial when improper intra-jury influences are at issue.' ") (alteration in original) (quoting *Resko,* 3 F.3d at 694); *United States v. Richman,* 600 F.2d 286, 295 (1st Cir.1979).

We see no abuse of discretion in the district court's treatment of this matter. The court questioned the legal secretary and each of the two jurors thought to be involved, and then briefly canvassed the jury as a whole. The responses supported the court's findings that "there have been no such conversations" and "the defendants have not been prejudiced."

Defendants argue that the court should not have credited the jurors' statements over the account of the legal secretary, at least not without additional individual interviews with the other jurors. Defendants argue (with substantial force) that the legal secretary was highly credible because she was employed by the government and because her account was particular, emphatic, and potentially detrimental to the prosecution, whereas the jurors may have been embarrassed and faced no cross-examination. As we have noted, however, this Court reviews a court's handling of alleged juror misconduct only for abuse of discretion precisely because the district court is best situated to evaluate jurors' credibility. *See Panebianco*, 543 F.2d at 457.

Also, in weighing the competing accounts, the district court need not have credited the legal secretary's inference that the jury desired a "conviction." It is clear enough that poking Juror A to keep her awake might ensure that the trial culminates in a *verdict*, but it is much less clear how it would secure a *conviction*. A desire to obtain a conviction might suggest prejudice and misconduct, but a desire to reach a verdict is no more than a desire to fulfill the obligations of a juror. A lay person (like Juror A) may not appreciate the distinction between these terms. It is possible, indeed even likely, that Juror A confused them and misspoke.[6]

Moreover, as the district court noted, a court should generally presume that jurors are being honest. "[A]bsent evidence to the contrary, we presume that jurors remain true to their oath and conscientiously observe the instructions and admonitions of the court." *United States v. Rosario*, 111 F.3d 293, 300 (2d Cir.1997) (quoting *United States v. Easter*, 981 F.2d 1549, 1553 (10th Cir.1992)). As the Supreme Court observed in *Smith v. Phillips*, 455 U.S. 209, 102 S.Ct. 940, 71 L.Ed.2d 78 (1982), "one who is trying as an honest man to live up to the sanctity of his oath is well qualified to say whether he has an unbiased mind in a certain matter." *Id.* at 217 n. 7, 102 S.Ct. 940 (rejecting habeas petitioner's argument that testimony of juror with alleged conflict of interest was "inherently suspect") (quoting *Dennis v. United States*, 339 U.S. 162, 171, 70 S.Ct. 519, 94 L.Ed. 734 (1950)). The court did not abuse its discretion by accepting the jurors' account.

Because the court found properly that there had been no misconduct, defendants' reliance on *United States v. Resko*, 3 F.3d 684 (3d Cir.1993), is misplaced. In *Resko*, the district court ascertained by questionnaire that all of the jurors had engaged in premature deliberation, but that none of them had formed an opinion about the defendants' guilt. *Id.* at 688. The Third Circuit remanded for a new trial because the proof of juror misconduct required a more searching inquiry into prejudice. *Id.* at 694.

---

**6.** The record suggests that Juror A was prone to error in her choice of words. She told Judge Nevas that she drinks lots of coffee because she is "allergic" to it, evidently a malapropism for "addicted." (Tr. of Chambers Hearing, dated Jan. 22, 2001, at 3.) In her brief conversation with the legal secretary, she was sleepy and enjoying a delayed smoke; she could easily have confused the wish to "convict" with the wish to reach a "verdict," especially if she was leaning toward conviction.

In the present case, no juror said that there had been premature deliberations. Judge Nevas conducted an individualized examination of the two jurors he thought were relevant and found neither misconduct nor prejudice.[7] In an abundance of caution, Judge Nevas gave reinforcing instructions. He reminded the jurors "not to discuss this case with anyone," "not to make any determinations until you have heard all the evidence," and to keep an open mind and await all of the evidence, closing arguments, and instructions. (Tr. of Jury Trial, dated Jan. 19, 2001, at 47–48; Tr. of Jury Trial, dated Jan. 22, 2001, at 14.) "In many instances, the court's reiteration of its cautionary instructions to the jury is all that is necessary." *Thai*, 29 F.3d at 803; *see also Abrams*, 137 F.3d at 708 (holding court did not abuse discretion "in deciding to deal with the juror's note solely by giving a curative instruction" when there was no evidence of misconduct or prejudice); *United States v. Read*, 658 F.2d 1225, 1241–42 (7th Cir.1981); *Panebianco*, 543 F.2d at 457. Defendants argue that the court failed to give a proper curative instruction, but in the absence of a problem, no particular cure was prescribed.

Finally, we must recognize that, while a court looking into juror misconduct must investigate and, if necessary, correct a problem, it must also avoid tainting a jury unnecessarily. *See Abrams*, 137 F.3d at 708 ("[A]ny such investigation is intrusive and may create prejudice by exaggerating the importance and impact of what may have been an insignificant incident."). In this endeavor, sometimes less is more. An individualized examination of each juror in this case could have highlighted the issue unnecessarily, disrupted the trial, and impaired the ability of the jurors to deliberate with each other. As Judge Nevas observed, he had to "walk a fine line." (Tr. of Chambers Hearing, dated Jan. 22, 2001, at 16.) In light of the court's "broad flexibility" to determine its response to alleged juror misconduct, especially where intrajury discussions are at issue, *see Thai*, 29 F.3d at 803, we conclude that Judge Nevas acted well within the scope of his considerable discretion.

## CONCLUSION

For the foregoing reasons, as well as those stated in the summary order issued today, we affirm the judgments of conviction and the sentences.

---

7. *Resko* itself noted that it was "an exception to the rule that a defendant must demonstrate prejudice before a new trial is warranted." 3 F.3d at 694. The present case is more closely analogous to another Third Circuit case, *United States v. Bertoli*, 40 F.3d 1384 (3d Cir. 1994), where the court found no error in a district court's handling of alleged premature deliberations. *Id.* at 1396. A juror in that case reported that three alternates had discussed the case with her. The court interviewed the four persons involved—once with counsel present and once alone *in camera*—and decided to disqualify the three alternate jurors. The court "satisfied itself" that the juror "had not prejudged the case," however, and kept the jury intact. *Id.* at 1394–95. While Judge Nevas removed no one, he pursued a similar approach, concluded there was no prejudice, and kept the jury intact.