
IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 36688-0-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| HECTOR OROZCO JR., | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

SIDDOWAY, J. — Hector Orozco appeals his convictions of first and second degree murder and several lesser charges, contending that his rights under the United States Constitution to due process and a fair trial were violated by a biased jury. Essentially, he

asks us to find that if a trial court excuses a juror because she received extraneous information; accepts as credible her representation that she did not discuss the information with other jurors; and denies a defense request to poll the remaining jurors, it abuses its discretion. We find no abuse of discretion and affirm.

PROCEDURAL BACKGROUND

The facts underlying Mr. Orozco's convictions of one count of first degree murder, one count of second degree murder, and several lesser crimes, are almost entirely irrelevant to the jury issues on appeal. The one relevant background fact is that the victim of Mr. Orozco's first degree murder was 82-year-old Bonnie Ross, who was beaten to death in her home by Mr. Orozco, who then stole her car.

*Jury selection*

The week before trial, the trial court met with the prosecutors and defense lawyers to discuss the parties' proposed juror questionnaire. The record reveals that at least 102 persons were summoned as potential jurors. It was agreed that after the venire members completed the questionnaire the following Monday morning, the lawyers would review the questionnaires and identify those they wanted to call in for individual voir dire. The trial court told the lawyers it wanted them to also confer about individuals they would stipulate to excuse.

The following Monday afternoon, shortly after 3:00 p.m., the trial court and lawyers convened after the lawyers had reviewed the completed juror questionnaires.

2

The trial court said it would start with the venire members whom the parties agreed could be dismissed. It said it wanted the defense to "go through those that they would agree to stipulate to dismiss regardless of reason, and as you call each one, [prosecutor] or [deputy], give us a yay or nay." Report of Proceedings (RP) at 110. Early on, when one of the lawyers got too expansive, the trial court reminded him, "[A]ll I'm lookin' for is a yay or nay whether you stipulate." *Id.* It added that they needed to go through quickly because court staff needed to enter juror information into the computer that afternoon. Members of the venire had been told to call in after 5:30 p.m. to determine whether and when they needed to return to court.

When defense counsel's list of jurors he proposed to excuse reached juror 32, he evidently read a disclosure on juror 32's questionnaire:

> [DEFENSE COUNSEL]: Number 32, very dense connection with law enforcement related to Sheriff Raymond, Detective Lee Burrowes.
> [DEPUTY PROSECUTOR]: We're not gonna agree, your Honor.
> THE COURT: Okay. Next?

RP at 116.

After review was completed of the venire members that one side or the other wanted to excuse, the trial court said, "Now, why don't each side just run through the list of those that you want to see individually. I don't think we need explanation for any of 'em. Just run through the numbers." RP at 122-23. Neither the defense nor the State asked to question juror 32 individually.

3

After individual voir dire was completed, general voir dire was conducted. During general voir dire, juror 32 was not specifically asked any questions and did not respond to any questions posed to the group. At the conclusion of the general voir dire, Mr. Orozco's lawyer informed the court, "We would pass for cause, your Honor." RP at 360.

*Trial*

Upon arriving at court on the morning of the second day of testimony—a Friday— juror 13 told the bailiff she had received a phone call the night before from a relative of victim Ross. The trial court informed the parties of this development at the outset of proceedings and juror 13 was brought into the courtroom for questioning. Juror 13 reported in response to questions that a friend and former coworker of hers, Vicky, called the night before and said, "'I hear you got on the jury with the guy that killed my nephew's wife's grandma.'" RP at 660. Juror 13 said she responded, "Stop talking," and Vicky apologized. She said she told Vicky, "I can't talk to you until this trial's over," and they did not discuss the case further. RP at 660.

Juror 13 said she felt bad and Vicky also felt bad for bringing it up. She said Vicky probably told her about the death when it happened, but she did not remember the conversation and "did[ no]t put two and two together because this lady has like 24 great nieces and nephews." RP at 657. Mr. Orozco's name never came up. Juror 13 said that even after sitting through the trial, she did not remember being told about it until the phone call. She acknowledged that she and Vicky were good friends. She said knowing

4

that one of the deceased was a relative of a friend of hers would not affect her ability to be fair and impartial.

Asked how Vicky found out she was on a jury, juror 13 said another friend, Sue, was aware she had been summoned and called to see if she had been seated on the jury. Juror 13 said she had, "and that's all we said." RP at 659. Vicky told juror 13 that she learned juror 13 was on the jury from Sue.

Invited to speak after juror 13 was excused from the courtroom, defense counsel said:

> [T]his is just an absolutely horrible situation. The defense team has talked about that juror specifically as being more receptive to our case based on her mannerisms than any other juror on the pool. That is the only juror that we have had specific discussions about being receptive to our case.[1]
> Now, an outside person who is a family member of one of the decedents has called to tell her—to talk about it. Clearly, they're tampering with—with the jury pool, and by "they" I'm not implying the State, of course. This woman was attempting to influence this juror, and based on the decades-long, close friendship between this woman and the juror, I can't imagine that she could still be impartial.

RP at 663. The defense moved for a mistrial. It argued that if it had known juror 13 was friends with even a distant relative of Ms. Ross, it would have struck her.

---

[1] During general voir dire, juror 13 said in response to questions that she had been on a jury previously, enjoyed it, and learned a lot. She said a challenge was that during deliberations jurors are not allowed to ask questions. She recalled asking the bailiff a question and the bailiff replied they had all the information they needed.

Asked by defense counsel if a question directly relating to whether an element had been proved came up that the court did not answer, she answered that she would find the defendant not guilty.

5

The trial court acknowledged that the defense would have struck juror 13 had it known she was close friends with a relative of a victim. But defense counsel had said it was not accusing juror 13 of misrepresentation. The court found the defense charge of witness tampering to be speculative, because laypersons would not know they are not supposed to speak to a juror, and Vicky might have been calling to say, "'Wow, that's weird you're on that trial.'" RP at 672. It observed that the prosecutor said multiple times in opening statement that Mr. Orozco killed Ms. Ross, "So, that's nothing new." RP at 672. It added that juror 13 had followed its instructions perfectly and did not appear to have any emotional investment in the case because she could not recall any details of her conversation with Vicky a year earlier. In the absence of misrepresentation or actual bias, it saw no grounds for removing her, and said, "I certainly don't find grounds to grant your request for a mistrial." RP at 673.

The following Monday morning, the defense asked to speak with the trial court before the jury was brought in and informed the court that its investigator had recorded an interview with juror 13's friend Vicky over the weekend. Based on the additional information, defense counsel said, "I believe the State is going to join us in our motion to have Juror 13 removed from the jury pool." RP at 773. It said its investigator would be available to share what he had learned that afternoon. The prosecutor clarified that "we may not be objecting" to a defense request to excuse the juror. RP at 774.

6

The trial court said it was its preference to keep the trial going and take the issue up at the end of the day. The defense did not object to that procedure.

After the jurors were excused for the day, the defense investigator was sworn and testified that he had conducted a recorded interview with Vicky Keller, juror 13's friend, over the weekend. The recording was not played, but defense counsel elicited the following testimony from the investigator about what he was told by Ms. Keller:

> Q. In that recorded statement, did she use a pejorative term to refer to the defendant in this case, Mr. Orozco?
>
> A. She did.
>
> Q. What did she call him?
>
> A. A scumbag.
>
> Q. And she said that to our juror over the phone?
>
> A. Yes.
>
> Q. Did she also tell the juror that Mr. Orozco had committed the crime?
>
> A. Yes.
>
> Q. And did she, at any time, indicate that she knew that she might not be allowed to make that phone call, that it might be wrong to call and talk to the juror?
>
> A. I—I believe she told her friend, the juror, that she knew she probably shouldn't be calling, but she did.

RP at 888.

The defense renewed its motion to have juror 13 excused from the jury, and this time the State responded that it "would rather err on the side of caution" and did not object. RP at 889. The trial court granted the motion.

7

The trial court said it would like to inform juror 13 by phone call that she did not need to come in the following morning, but invited input from the lawyers. Defense counsel expressed an interest in determining from juror 13 whether she had talked to other jurors about her phone call, and the State agreed. The trial court accepted that proposal. Court staff was able to contact juror 13 and have her return to the courthouse for questioning that afternoon.

On juror 13's arrival, the trial court explained to her that it was extraordinary, but he had some follow-up questions for her. Asked whether she disclosed to any of the jurors that Vicky had called her, or why she had been questioned on the witness stand the prior week, or the subject matter of Vicky's call, she answered no to each question. She also said that none of her fellow jurors asked her about these things. The trial court then explained to her that she was being excused:

> THE COURT: . . . I've got something hard to say to you, and so I'll just come right out with it. An investigator went and talked to Vicky, and what Vicky told him is that she described the defendant as a scumbag in that conversation with you.
>
> JUROR NUMBER 13: Yeah.
>
> THE COURT: You know, it's—it's the judgment of all of the lawyers here that having that kind of contact and during the middle of a homicide trial really disqualifies you—
>
> JUROR NUMBER 13: Okay.
>
> THE COURT: —from being a juror.
>
> It certainly wasn't your fault, and I was thrilled, I was thrilled when I heard your testimony last week that you immediately said, "Stop."

8

JUROR NUMBER 13:  Yeah.

THE COURT:  Because you're serious about applying my instructions.

JUROR NUMBER 13:  Right.

THE COURT:  But we'll have to let you go.

RP at 895.

The next morning, defense counsel asked if the court would be willing to individually inquire of the remaining jurors whether or not they received any information from juror 13.  The court responded:

No.  We're gonna take her word for it.  I just don't want to open that can of worms and cause them to speculate about what may or may not have happened.  I think it will cause more trouble than good quite frankly.

RP at 900.  When the jurors were brought in, the court told them:

You were all probably a bit surprised to find there's only 13 of you rather than the 14 you started with.  Remember, a jury is comprised of 12 people.  We seated 14 because experience has shown from time to time some of the jurors just simply can't go the distance, and that's what has happened here.  So, 13 won't be with us anymore.
So, 12 of you plus now one alternate.  Hope we can make it to the end of the trial.

RP at 902.

The jury did make it to the end of the trial.  It found Mr. Orozco guilty of most of the charges against him.  He appeals.

9

ANALYSIS

*Juror 32*

Mr. Orozco makes two assignments of error, the first of which—an alleged denial of a defense motion to dismiss juror 32 for cause—mischaracterizes the proceedings. Under no reasonable reading of the record did the defense move to dismiss juror 32 for cause. In a preliminary run-through of jurors the parties would stipulate to excuse, the defense proposed to excuse juror 32 and the State disagreed. The defense did not seek to individually question juror 32, did not question him in general voir dire, and most importantly, told the trial court when voir dire was finished, "We would pass for cause, your Honor." RP at 360.

Alternatively, Mr. Orozco argues that juror 32 was actually or impliedly biased, a defect that can be raised for the first time on appeal. Both the United States and Washington State Constitutions provide a right to trial by an impartial jury in all criminal prosecutions. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. Seating a biased juror violates this right. *State v. Guevara Diaz*, 11 Wn. App. 2d 843, 851, 456 P.3d 869 (citing *State v. Irby*, 187 Wn. App. 183, 193, 347 P.3d 1103 (2015)), *review denied*, 195 Wn.2d 1025, 466 P.3d 772 (2020). A trial judge has an independent obligation to protect that right, regardless of inaction by counsel or the defendant. *Irby*, 187 Wn. App. at 193.

"Both RCW 2.36.110[2] and CrR 6.4(c)(1)[3] create a mandatory duty to dismiss an unfit juror even in the absence of a challenge." *State v. Lawler*, 194 Wn. App. 275, 284, 374 P.3d 278 (2016).

A juror demonstrates actual bias when he exhibits "a state of mind . . . in reference to the action, or to either party, which satisfies the court that the challenged person cannot try the issue impartially and without prejudice to the substantial rights of the party challenging." RCW 4.44.170(2). Implied bias requires "'the existence of the facts [that] in judgment of law disqualifies the juror.'" *Kuhn v. Schnall*, 155 Wn. App. 560, 574, 228 P.3d 828 (2010) (alteration in original) (quoting RCW 4.44.170(1)). RCW 4.44.180 provides four bases for a challenge for implied bias: consanguinity to a party, certain relationships to a party such as landlord and tenant, having served as a juror in a case with substantially the same facts, and interest in the event of the action or the principal question.

---

[2] "It shall be the duty of a judge to excuse from further jury service any juror, who in the opinion of the judge, has manifested unfitness as a juror by reason of bias, prejudice, indifference, inattention or any physical or mental defect or by reason of conduct or practices incompatible with proper and efficient jury service." RCW 2.36.110.

[3] "If the judge after examination of any juror is of the opinion that grounds for challenge are present, he or she shall excuse that juror from the trial of the case. If the judge does not excuse the juror, any party may challenge the juror for cause." CrR 6.4(c)(1).

Mr. Orozco argues that the language uttered when defense counsel proposed to excuse juror 32 by stipulation—"very dense connection with law enforcement related to Sheriff . . . Raymond, . . . Detective Lee Burrowes"—came from juror 32's juror questionnaire. Appellant's Opening Br. at 6. The questionnaire is not included in the clerk's papers, nor can we otherwise confirm this from the record on appeal. But the State does not dispute it, so we assume it to be correct. We *can* determine from the record that no "Sheriff Raymond" or "Detective Lee Burrowes"—whoever they are— were witnesses or were otherwise mentioned during Mr. Orozco's trial.[4]

Mr. Orozco argues that the statement, "very dense connection with law enforcement related to Sheriff Raymond, Detective Lee Burrowes," establishes juror 32's actual bias because it reveals "a favoritism or predisposition toward a category of individuals, such as police officers." Appellant's Opening Br. at 7. He argues it establishes his implied bias because it "made clear that he had some degree of potential consanguinity or affinity with lead law enforcement officers, and similarly had a potential close business relationship with these individuals." *Id.* at 7-8.

It establishes neither. Asking venire members about their own, their family members' or any close friend's employment by a law enforcement agency is standard in

---

[4] The State implies that they are with the Franklin County Sheriff's Office, which was not the law enforcement agency with responsibility for this case. Resp't's Br. at 15. That, too, is not in our record.

criminal cases. *See, e.g.*, *State v. Cho*, 108 Wn. App. 315, 327, 30 P.3d 496 (2001).

"Yes" answers are not uncommon and are not disqualifying.

This court has previously determined that "there is nothing inherent in the

*experience or status* of being a police officer that would support a finding of bias." *Id.* at

324 (emphasis added). Nothing inherent in *having a relationship* with a police officer

supports such a finding either. "A relationship with the government, without more, does

not establish bias." *Id.* Mr. Orozco does not demonstrate that juror 32 was actually or

impliedly biased.

*Juror 13*

Mr. Orozco's second assignment of error is to the trial court's denial of his motion

for a mistrial and denial of his alternative request to question jurors about any

information shared by juror 13.

"A trial court's denial of a motion for mistrial will be overturned only when there

is a 'substantial likelihood' that the error prompting the request for a mistrial affected the

jury's verdict." *State v. Rodriguez*, 146 Wn.2d 260, 269-70, 45 P.3d 541 (2002) (quoting

*State v. Russell*, 125 Wn.2d 24, 85, 882 P.2d 747 (1994)). Our review of the effect of the

court's ruling on the jury's verdict must take into consideration the fact that juror 13 was

excused from the jury. Mr. Orozco does not demonstrate that extraneous information

provided to juror 13, who was excused well before deliberations began, had a substantial

likelihood of affecting the jury's verdict.

We review a trial court's decisions regarding investigation of jury problems for an abuse of discretion. *State v. Elmore*, 155 Wn.2d 758, 773-74, 123 P.3d 72 (2005). There is no "mandatory format" for the process and courts have discretion to "resolve the misconduct issue in a way that avoids tainting the juror and, thus, avoids creating prejudice against either party." *State v. Jorden*, 103 Wn. App. 221, 229, 11 P.3d 866 (2000). The trial court's discretion in determining the scope and manner of investigation that is most appropriate in a particular case is broad. *Elmore*, 155 Wn.2d at 773-74. We recognize that the trial court is uniquely suited to make credibility determinations that arise in the course of investigating juror issues. *Id.* at 778.

We defer to the trial court's assessment of juror 13's credibility. Mr. Orozco challenges that assessment, questioning her credibility because she did not report that Ms. Keller referred to Mr. Orozco as a "scumbag." Assuming that the word "scumbag" was used,[5] it was implicit that whoever beat 82-year-old Ms. Ross to death to steal her car *was* a scumbag. Ms. Keller's use of that word might not have been memorable to juror 13.

The potential for prejudice if juror 13 did say something is incredibly small. Juror 13 might have been biased because she received not only the information, but also a good

---

[5] We do not know that it was used. Perhaps Ms. Keller misremembered the words she used in the conversation. And when juror 13 said, "Yeah," in response to the trial court telling her about the investigator's interview, she might simply have been acknowledging what she was being told—as she did in response to the court's other statements. *See* RP at 895 ("Yeah," "Okay," "Yeah," "Right").

14

friend's strong feeling about the information. It is difficult to imagine that another juror would be biased by a second-hand report that one of Ms. Ross's granddaughter's husband's great aunt thought Mr. Orozco was the "scumbag" who killed her very distant relative, however. And as long as it complied with RPC 3.5(c), the defense could task its investigator with talking to jurors after the trial, with a view to making a new trial motion if juror 13 had in fact reported information to others.

The trial court's concern that questioning all of the jurors could present its own problems was a legitimate one. As the federal Second Circuit Court of Appeals has observed, investigation into possible juror misconduct or bias "'is intrusive and may create prejudice by exaggerating the importance and impact of what may have been an insignificant incident.'" *United States v. Peterson*, 385 F.3d 127, 135 (2d Cir. 2004) (quoting *United States v. Abrams*, 137 F.3d 704, 708 (2d Cir. 1998)). "'[W]hile a court looking into juror misconduct must investigate and, if necessary, correct a problem, it must also avoid tainting a jury unnecessarily.'" *Id.* (alteration in original) (quoting *United States v. Cox*, 324 F.3d 77, 88 (2d Cir. 2003)). "Thus, '[i]n this endeavor, sometimes less is more.'" *Id.* (alteration in original) (quoting *Cox*, 324 F.3d at 88). "An individualized examination of each juror . . . could . . . highlight[ ] the issue unnecessarily, disrupt[ ] the trial, and impair[ ] the ability of the jurors to deliberate with each other." *Cox*, 324 F.3d at 88.

No abuse of discretion is shown.

15

No. 36688-0-III
*State v. Orozco*

Affirmed.

A majority of the panel has determined this opinion will not be printed in the

Washington Appellate Reports, but it will be filed for public record pursuant to RCW

2.06.040.

_____
Siddoway, J.

WE CONCUR:

_____
Pennell, C.J.

_____
Lawrence-Berrey, J.