United States v. Haynes

UNITED STATES COURT OF APPEALS

For the Second Circuit

_____

August Term, 2013

Argued:  March 8, 2013          Decided: September 5, 2013

Docket No. 12-626-cr

_____

United States of America,

Appellee,

—v.—

Tara Haynes

Defendant-Appellant.

_____

Before: SACK and LOHIER, Circuit Judges, and KOELTL, District Judge.*

After a jury trial in the United States District Court for the Northern

District of New York ("NDNY"), the defendant, Tara Haynes, was convicted of

_____

* The Honorable John G. Koeltl, of the United States District Court for the
Southern District of New York, sitting by designation.

1

one count of importation of 500 grams or more of a substance containing methamphetamine in violation of 21 U.S.C. §§ 952 and 963 and one count of possession with intent to distribute that substance in violation of 21 U.S.C. § 841(a)(1). The defendant was sentenced principally to 188 months imprisonment on each count to run concurrently. In this appeal from the judgment entered on January 30, 2012, the defendant alleges numerous errors. We find that the cumulative effect of the various errors—including the defendant's improper shackling, the failure to investigate potential jury misconduct, an improper <u>Allen</u> charge, and serious evidentiary errors— undermined the guarantee of fundamental fairness to which the defendant is entitled. Therefore, we vacate the defendant's conviction and remand for proceedings consistent with this opinion.

VACATED AND REMANDED.

_____

MARC FERNICH AND JONATHAN SAVELLA, Law Office of Marc Fernich, <u>for Defendant-Appellant Tara Haynes</u>.

JULIE S. PFLUGER AND PAUL D. SILVER, Assistant United States Attorneys, _for_ Richard S. Hartunian, United States Attorney for the Northern District of New York, _for Appellee United States of America_.

_____

John G. Koeltl, District Judge:

After a jury trial in the United States District Court for the Northern District of New York ("NDNY"), the defendant, Tara Haynes, was convicted of one count of importation of 500 grams or more of a substance containing methamphetamine in violation of 21 U.S.C. §§ 952 and 963 and one count of possession with intent to distribute that substance in violation of 21 U.S.C. § 841(a)(1). The defendant was sentenced principally to 188 months imprisonment on each count to run concurrently. In this appeal from the judgment entered on January 30, 2012, the defendant alleges numerous errors. We find that the cumulative effect of the various errors—including the defendant's improper shackling, the failure to investigate potential jury misconduct, an improper _Allen_ charge, and serious evidentiary errors—undermined the guarantee of fundamental fairness to which the defendant is

entitled. Therefore, we **VACATE** the defendant's conviction and **REMAND** for proceedings consistent with this opinion.

# BACKGROUND

On June 2, 2011, the defendant, Tara Haynes, was arrested at the border of the United States and Canada at the Champlain Port of Entry in New York. Customs and Border Patrol Officers recovered approximately 70,000 pills wrapped in plastic from the gas tank of the rental car the defendant was driving. The pills contained methamphetamine.

On August 11, 2011, a grand jury in the NDNY returned a two-count superseding indictment against the defendant. Count I alleged that the defendant had knowingly and intentionally imported and attempted to import into the United States various controlled substances, including 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, in violation of 21 U.S.C. §§ 952 and 963. Count II alleged that the defendant knowingly and intentionally possessed with the intent to distribute those controlled substances in violation of 21 U.S.C. § 841(a)(1).

The defendant's trial began on August 16, 2011. The defendant was shackled throughout the trial. The trial transcript does not contain any findings as to why it was necessary to shackle the defendant during the trial. However, when the defendant took the stand to testify, the Court instructed the jury to leave the courtroom, and the defendant walked to the stand out of the presence of the jury. The only other mention of the shackles in the record occurred when defense counsel stated in summation as follows:

> [The defendant is] locked here in shackles right now. She was sitting up in the [witness stand] and I don't want you to think it was disrespect that she didn't stand up but it's the rules of the court because they had taken awa[y] her liberty. It's not the judge's fault. This is what these agents did. No criminal record, no prior arrests, 34 years old, consistent job for four years, two kids and they have taken away her liberties on this.

(Trial Tr. 626)

The trial lasted only four days from the start of jury selection to the beginning of jury deliberations. The evidence was introduced in less than three days. The Government's theory at trial was that the defendant was a "drug courier," which was why she acted nervously and gave inconsistent responses to

5

law enforcement officers at the border. (Trial Tr. 25) The defendant's theory at trial was that she was simply a "blind mule" who had no knowledge that there were any narcotics in her rental car. (Trial Tr. 34)

At trial, law enforcement officers testified about the circumstances of the defendant's arrest at the border and the inconsistent statements that the defendant made during her arrest. The officers testified that they observed indications that drugs were present in the car, including the presence of masking agents used to hide the odor of drugs, namely a newly opened air freshener hanging from the car's windshield and an aerosol spray can described as "new car scent" recovered from the defendant's purse. (Trial Tr. 201, 227) The defendant asked if she could discard the aerosol can, but was told that she could not. There was also an overwhelming smell of gasoline in the car. A law enforcement agent also testified that the defendant had a history of border crossings into the United States and provided details about the circumstances of those prior crossings.

The officers recovered approximately 70,000 pills weighing approximately 49.4 pounds wrapped in plastic and stuffed tightly in the rental car's gas tank.

An expert witness estimated that the value of the pills, which contained methamphetamine, was between $500,000 and $2,100,000.

Customs and Border Protection Officer Troy Rabideau testified in detail about the fuel light in the car, which indicated that the gas tank was empty although his search revealed that there were approximately four or five gallons of gas in the tank. The Government asked Officer Rabideau why the fuel light would be on when there was gas in the car, and defense counsel objected on the ground that the question called for expert testimony. The objection was overruled. Officer Rabideau answered as follows:

> On the outside of this cylinder, there's a float and that's –- the float is what shows that the gas level, so as the float goes down, the gas level in the vehicle obviously goes down. So, when the drugs were placed and the float was pushed to the bottom, drugs holding that to the bottom would always read zero kilometers to empty. That would always be on empty.

(Trial Tr. 287-88) Officer Rabideau testified that the fuel indicator would remain on empty "[f]or as long as those drugs were in the vehicle." (Trial Tr. 288) Defense counsel objected on the basis of lack of foundation, and the Court overruled the objection. Officer Rabideau testified that he had not attended

"mechanic school," but that he had "looked in the gas tank prior to this" and that the fuel light had been on throughout his investigation. (Trial Tr. 309)

Before lunch on the third day of trial, the Government rested. The defense case consisted of the testimony of a friend of the defendant who explained that the defendant was a single mother of two children and that she had once taken a seemingly benign New Year's Eve trip with the defendant from Canada to New York in the defendant's car.

The defendant testified in her own defense. She testified that she rented the car on Tuesday, May 31, 2011 in anticipation of traveling to New York City for the weekend. On Wednesday, June 1, 2011, the defendant was driving with her former boyfriend who pointed out the aerosol can in the car's glove compartment. The defendant testified that at about 9:30p.m. on Thursday, June 2, 2011, just prior to leaving for New York, she stopped at a convenience store and purchased some food for her ride. She also bought a hanging air freshener because she thought it was cute. She testified that as she approached the Champlain Port of Entry she removed the aerosol can from the glove compartment to use it to mask her foot odor, but she found that it was empty.

8

The defendant testified that she noticed the fuel light turn on as she approached the border, and she decided that she would refuel after crossing the border. She denied knowing that there were any drugs in the car.

The defendant described her interactions with law enforcement officers at the border and the circumstances surrounding her arrest. The defendant admitted that she had lied to the officers about whether she took the rental car in for an oil change prior to reaching the border crossing. The defendant also testified that she was "very upset" and "shocked" when an agent told her that 70,000 ecstasy pills had been recovered from the rental car. (Trial Tr. 542-43)

On cross-examination, the Government pointed out that although the defendant had testified that the agent had told her there were 70,000 ecstasy pills recovered from the car, the pills had not been counted by the time the agent met with the defendant. The defendant also admitted on cross-examination that she had lied to the officers about why she was going to New York.

The defense called an expert witness to support its theory that the defendant was operating as a "blind mule" for drug distributors. The defense's expert witness, Richard Stratton, had been a marijuana distributor who had

9

trafficked drugs across international borders and had studied and written articles about drug distribution. Over the Government's objection, the Court permitted the defense expert witness to testify regarding the modus operandi of drug distributors provided that neither party would attempt to "elicit the expert's opinions on the ultimate issue of defendant's knowledge." (Trial Tr. 499) Mr. Stratton testified that when he was a drug distributor he "used blind mules whenever [h]e had the opportunity," and explained their advantages. (Trial Tr. 567)

In its rebuttal case, the Government re-called Special Agent Russell Linstad of the Department of Homeland Security who had testified as an expert witness in the Government's case-in-chief about the value of the drugs seized. The Government re-called Agent Linstad to "point out the flaws in a blind mule scenario" as explained by the defense and its expert witness. (Trial Tr. 589) Agent Linstad testified as follows:

> With the blind mule . . . the person's going to be unwitting, not know that there's anything going on with the load. So in this case, after reviewing the case, in my opinion the defendant realized, especially with inconsistency in the [defendant's] statements, the strong odor of gasoline, the fuel light and also masking agents to

keep it.  Again, an organization wants it blind.  They can't have people know that there is a load or that there [are] narcotics in the vehicle.

(Trial Tr. 589)

The defense rested at the end of the third day of trial.  The following day, after summations, the Court charged the jury.  The jury deliberated for approximately three and a half hours before sending a deadlock note, which the Court explained as follows:

I have received a note, timed 3:36, from the foreperson of the jury, and I have now given copies to both counsel.  I have asked our clerk to mark the note for identification as Court's Exhibit No. 1.  The note says, "Your Honor, we are hopelessly deadlocked.  Help."

As both counsel know, the jury's been out since approximately 12 P.M., and at this point in time my plan is to bring them back in and informally ask them to go back in and continue their deliberations with an eye toward whether they can reach a verdict.

. . . .

I'm not at the point right at this moment where I think that I have to give the Allen charge. . . .  [M]y plan is to bring [the jury] in, acknowledge that they have been at it for a few hours, but to tell them that for both sides this is a very important matter and to ask them to continue their deliberations.

11

(Trial Tr. 681) There were no objections. The Judge then called the jury back into the courtroom, but did more than simply ask the jury to continue to deliberate.

The Court instructed the jury as follows:

> Members of the jury, I'm going to ask you to return to the jury room and deliberate further. I realize that you are having some difficulty reaching a unanimous agreement, but that is not unusual. And often after further discussions jurors are able to work out their differences and agree.
>
> It is your duty as jurors to consult with one another and to deliberate with a view toward reaching an agreement, if you can do so without violence to individual judgment. Each of you must decide the case for yourself. But do so only after an impartial consideration of the evidence in the case with your fellow jurors. In the course of your deliberations, do not hesitate to re-examine your own views and change your opinion if convinced it is erroneous but do not surrender your honest conviction as to the weight or effect of evidence solely because of the opinion of your fellow jurors or for the mere purpose of returning a verdict.
>
> Listen carefully to what the other jurors have to say and then decide for yourself if the Government has proved the defendant guilty beyond a reasonable doubt.
>
> What I have just said is not meant to rush or pressure you into agreeing on a verdict. Take as much time as you need to discuss things. There is no hurry with this instruction, I will now return you to the jury room. Thank you.

12

(Trial Tr. 682-83)

Although the Court had said that it was not going to give an <u>Allen</u> charge, the supplemental charge that the Court gave had the hallmarks of what is generally known as a modified <u>Allen</u> charge. <u>See</u> <u>Allen v. United States</u>, 164 U.S. 492 (1896); <u>see also</u> <u>Spears v. Greiner</u>, 459 F.3d 200, 204 n.3 (2d Cir. 2006). It instructed the jurors to consult with each other, to deliberate with a view toward reaching a verdict, and told them not to "hesitate to re-examine [their] own views and change [their] opinion," but not to "surrender [their] honest conviction." (Trial Tr. 682-83) Neither the Government nor the defense objected to the supplemental charge.

Later that day, at approximately 5:00p.m., the Judge explained to counsel that the jury would be dismissed and asked to return the following Monday at 9:30a.m. The Court said that it would not "give [the jury] a full <u>Allen</u> charge at this time," but would ask them to come back on Monday to try to come to a unanimous verdict." (Trial Tr. 684) At that point, defense counsel indicated that he wanted to discuss another matter with the Court concerning a statement

13

made to him by an alternate juror about a conversation between jurors prior to the beginning of their deliberations:

> Judge, I just note that when I had gone outside last time I saw the alternate, he talked to me and he said that some of the women on the jury had said that [the defendant] might be guilty, she's here. And he had said that didn't fly, in sum and substance of that. I mean, obviously they shouldn't have – he obviously didn't give any specifics or anything like that but [it] really does concern me that there was some sort of discussion to that extent and, I mean, it would be a dereliction of my duty if I didn't ask for a mistrial in th[is] case.

(Trial Tr. 684-85) The Judge responded that the jury had been "continuously advised that if there were any discussions prior to deliberations, that it should be brought to [the Court's] attention immediately," and "no juror brought anything like that to [the Court's] attention." (Trial Tr. 685) The Court continued, "I'm not saying that the information that you're getting from the alternate isn't accurate. I'm just saying that no juror brought anything like that to my attention." (Trial Tr. 685) The Judge denied the motion for a mistrial and did not inquire further into the comments that defense counsel had brought to the Court's attention.

The Judge then received a note from the jury requesting clarification on the counts, the amount of drugs, reasonable doubt, and the absence of evidence. The Judge explained to the parties that the Judge intended to dismiss the jurors and address the note on Monday morning by re-reading the portions of the indictment, verdict sheet, and charge referenced in the note from the jury.

However, before the Court brought the jury out to be dismissed for the day, defense counsel again raised the alleged comments by the alternate juror and requested a "curative instruction" or for a renewal of the instruction that "if there was any discussion about the presumption [of innocence] or anything like that prior to the entry of deliberations, that it be disclosed to the Court." (Trial Tr. 689) The Judge responded that the Court had "reminded the jury that [the defendant] is presumed innocent at all times" and that because there was "no indication from any juror that there was any inappropriate discussion [the Court would] refrain from questioning the jury at [this] time." (Trial Tr. 689) The Judge also stated that the Judge would not inquire about any premature deliberations.

The jury re-entered the courtroom, and the Court dismissed the jurors for the day. In the course of dismissing the jurors, the Judge stated:

15

I believe that on Monday, after you've had a restful weekend and are given instructions by me, when you retire into the jury deliberation room and you give each other fair and full consideration, you will be able to arrive at a just verdict.

Remember that you should not feel –- you should not feel any pressure of time in reaching your verdict. You should listen to each other's views and work as diligently as you can to arrive at a unanimous verdict. Rest assured that I will respond to your note Monday morning and then let you continue your deliberations.

(Trial Tr. 692) There was no objection.

On Monday, with the agreement of the parties, the Judge reviewed the verdict sheet with the jury and reread the charge on reasonable doubt, direct and circumstantial evidence, and certain charges relating to the absence of evidence. At approximately 10:00a.m., the Judge excused the jury to continue their deliberations. At approximately 2:30p.m., after about eight total hours of deliberations, the jury returned a unanimous verdict of guilty on both counts of the indictment.[1]

_____

[1] On the Special Verdict Form, the jury found the defendant guilty of importation and possession with intent to distribute 500 grams or more of a mixture or substance containing a detectable amount of methamphetamine, but found that the Government had not proved the defendant's guilt beyond a reasonable doubt

16

On January 30, 2012, the defendant was sentenced principally to a term of 188 months imprisonment on each count to run concurrently. On February 13, 2012, the defendant filed a notice of appeal.

**DISCUSSION**

The defendant argues that her conviction should be vacated because of numerous trial errors. In particular, the defendant raises the following grounds for vacating her conviction: (i) denial of due process because she was tried in shackles without a finding of necessity on the record; (ii) the Court's failure to investigate alleged juror misconduct; (iii) an improper <u>Allen</u> charge; (iv) evidentiary errors; and (v) ineffective assistance of counsel. We find that the defendant was improperly tried in shackles, the Court did not fulfill its obligation to investigate the allegation of juror misconduct, the Court gave an improper <u>Allen</u> charge, and certain lay and expert testimony was erroneously admitted at trial. These errors occurred in the context of a relatively short trial

---

of importation or possession with intent to distribute 50 grams or more of methamphetamine.

17

during which the jury deliberated for approximately three and a half hours before returning a deadlock note, and then deliberated for approximately another five hours before returning a verdict of guilty on both counts. Under all the circumstances of this case, the cumulative effect of these errors was to cast serious doubt on whether the defendant was provided due process of law at her trial. Accordingly, we vacate the defendant's conviction and remand for further proceedings consistent with this opinion.

## I.

## A.

The defendant argues that her conviction should be vacated because she was tried in shackles without a specific finding of necessity on the record by the District Court Judge. It is beyond dispute that a defendant may not be tried in shackles unless the trial judge finds on the record that it is necessary to use such a restraint as a last resort to satisfy a compelling interest such as preserving the safety of persons in the courtroom. "The law has long forbidden routine use of visible shackles during the guilt phase; it permits a State to shackle a criminal

18

defendant only in the presence of a special need." Deck v. Missouri, 544 U.S. 622, 626 (2005). This rule of fundamental fairness is a basic element of the due process of law protected by the Constitution. Id. at 629. As the Supreme Court has emphasized:

> [T]o contemplate such a technique, much less see it, arouses a feeling that no person should be tried while shackled and gagged except as a last resort. Not only is it possible that the sight of shackles and gags might have a significant effect on the jury's feelings about the defendant, but the use of this technique is itself something of an affront to the very dignity and decorum of judicial proceedings that the judge is seeking to uphold.

Illinois v. Allen, 397 U.S. 337, 344 (1970).

This Court has therefore held that a trial judge may order physical restraints on a party only "when the court has found those restraints to be necessary to maintain safety or security; but the court must impose no greater restraints than are necessary, and it must take steps to minimize the prejudice resulting from the presence of the restraints." Davidson v. Riley, 44 F.3d 1118, 1122-23 (2d Cir. 1995). A court may not delegate this discretion to another party, including the Bureau of Prisons or the United States Marshals, because the court must "consider all the evidence and ultimately make the decision [for itself]." Id.

19

at 1123 (quoting <u>Lemons v. Skidmore</u>, 985 F.2d 354, 358 (7th Cir. 1993)); <u>see</u>

<u>Hameed v. Mann</u>, 57 F.3d 217, 222 (2d Cir. 1995).  A judge may receive evidence if there is any factual dispute relevant to trying a defendant in physical restraints. <u>See</u> <u>Hameed</u>, 57 F.3d at 222.  However, the ultimate decision to impose any physical restraints during trial must be made by the District Court judge alone and must be made on the record.  <u>See</u> <u>id.</u>  Moreover, "[w]hen the trial judge delegates a decision, and gives no reason for the decision, that is not an exercise of discretion but an absence of and an abuse of discretion."  <u>Davidson</u>, 44 F.3d at 1123 (quoting <u>Lemons</u>, 985 F.2d at 358)); <u>see</u> <u>Hameed</u>, 57 F.3d at 222.

In this case, there is no suggestion and certainly no finding on the record why it was necessary to shackle the defendant, who had no prior criminal history.  There was no finding why the defendant was a threat to anyone or why the presence of United States Deputy Marshals in the courtroom would not have been sufficient to maintain the safety and security of all those present. Accordingly, it was clear error and a violation of the defendant's constitutional right to due process of law to have required the defendant to stand trial in shackles without a specific finding of necessity on the record by the trial judge.

During oral argument in this case, the Government explained the defendant's shackling in part by representing that it has been standard practice in the NDNY for criminal defendants in custody to be shackled during trial without a particularized finding of necessity on the record by the District Court judge. Because that troubling representation indicated that the practice was inconsistent with long-standing Supreme Court and Second Circuit precedent, this Court ordered the Government to explain in detail the alleged practice of trying defendants in shackles. After an initial incomplete response, the Government submitted a letter explaining as follows:

> [T]he Marshals Service advised . . . that defendants are neither routinely nor arbitrarily shackled during jury trials. In those cases where the Marshals Service believes that shackling is prudent or necessary, the Marshals Service articulates the basis for its recommendation to the trial judge. This recommendation is based upon factors such as the defendant's criminal history, the sentence the defendant faces upon conviction and the defendant's conduct while incarcerated. In all cases, it is the trial judge who makes the final determination regarding shackling. In the event the trial judge agrees with the Marshals Service's recommendation regarding shackling, leg irons, not handcuffs or waist chains, generally are utilized. Additionally, the Marshals Service made clear that they make every effort to ensure that the leg irons are obscured from the jury's view, both inside and outside of the courtroom. . . .

21

[T]he judges [with the exception of one who could not be reached] reported a practice consistent with the practice described by the Marshals Service.

The judges in this District take into account any security concerns raised by the Marshals Service that bear upon whether shackles ought to be used in a particular case. Armed with that information, the judges make an independent determination, on a case-by-case basis, whether the use of shackles is warranted. The judges also relayed that in the event shackles are used, every precaution is taken to ensure that those shackles are not visible to the jury. . . .

One of the responding judges indicated that he informs the defendant of his decision and provides the defendant an opportunity to be heard. Other judges do not create a record of their determinations; a record would be created if the defendant raised an objection to the use of shackles.

(Letter of Richard S. Hartunian by Paul D. Silver, ECF No. 82 (Apr. 11, 2013), at 2)

The general procedures, to the extent that they were accurately portrayed to this Court, do not conform to the requirements of clear Supreme Court and Second Circuit precedent. No physical restraints may be imposed on a criminal defendant during trial unless the District Court finds on the record that they are a necessary last resort. Where the District Court finds that shackles are necessary for the safety of the defendant or any persons in the courtroom, the Court must

22

ensure that the restraints are no greater than necessary to ensure safety during trial, and the Court must take steps to minimize any prejudice to the defendant from being tried in physical restraints. See Davidson, 44 F.3d at 1122-23. Any finding of necessity and all accommodations made to minimize the extent of the defendant's restraint during trial or to ensure that the jury does not become aware of any physical restraints on the defendant must be made on the record by the District Court.

The Government argues that there is no basis for reversal unless the shackles had a substantial and injurious effect on the jury's verdict, and the presence of the shackles could not have affected the jury's verdict unless the jury actually saw them. See Williams v. Woodford, 306 F.3d 665, 689 (9th Cir. 2002), abrogated on other grounds by Williams v. Woodford, 384 F.3d 567 (9th Cir. 2004); Moon v. Head, 285 F.3d 1301, 1307 (11th Cir. 2002). The record is silent as to whether any of the jurors saw the shackles during the trial. Defense counsel made some effort to avoid having the jurors see the shackles when the defendant took the stand to testify, but then—for whatever reason—he drew attention to

23

the shackling in the course of his summation. The jury was thus well aware of the shackling during their deliberations.

While we could remand this case for an evidentiary hearing to determine when the jurors first became aware of the shackles, any such hearing would be time consuming and burdensome for the jurors. Moreover, the trial court erred in permitting the defendant to be tried in shackles without a finding on the record that there was a compelling reason to do so that could not be achieved by less onerous means. It is unnecessary to remand this case for a hearing as to the necessity of trying the defendant in shackles and when the jurors became aware of the shackles because, as explained below, the cumulative effect of all the errors denied the defendant a fundamentally fair trial.[2] At any subsequent proceedings

---

[2] To the extent that the defendant asserts that defense counsel's acquiescence in the decision to try the defendant in shackles and then to raise that fact with the jury during summation constitutes ineffective assistance of counsel, this argument is addressed infra at III.

The Government argues that defense counsel's decision to refer in summation to the physical restraints on the defendant constitutes waiver. See United States v. Quinones, 511 F.3d 289, 320-21 (2d Cir. 2007) ("The law is well established that if, as a tactical matter, a party raises no objection to a purported error, such inaction constitutes a true waiver which will negate even plain error review." (internal quotation marks omitted)). However, it was error for the

24

consistent with this opinion, the District Court should decide on the record whether shackling the defendant is necessary as a last resort to satisfy a compelling reason, such as the preservation of safety in the courtroom.

**B.**

The defendant argues that her conviction should be reversed because the District Court failed to investigate the allegation of juror misconduct that defense counsel brought to the Court's attention. Defense counsel moved for a mistrial because he had heard from one of the alternate jurors that prior to deliberations "some of the women on the jury had said that [the defendant] might be guilty, [because] she's here." (Trial Tr. 684-85) The Court denied the motion for a mistrial and declined to investigate the matter or to speak with the alternate

---

Court to try the defendant in shackles without making a finding of necessity on the record, and that error contributed to the cumulative effect of a series of errors that denied the defendant a fundamentally fair trial. There is no indication that defense counsel waived that error. See id. Moreover, we do not know the rationale for referring to the shackles in summation and whether any of the jurors were aware of the shackles before that time.

regarding the jurors' alleged comments even though the Court conceded that it was not disputing the accuracy of the alternate juror's account.

The alleged comments of the jurors as reported to defense counsel raise two concerns: (i) that members of the jury were actually biased against the defendant; and (ii) that the jury deliberated prematurely in violation of the Judge's instructions not to deliberate until they had heard all the evidence and were instructed on the law. It is well established that at minimum, "[d]ue process means a jury capable and willing to decide the case solely on the evidence before it, and a trial judge ever watchful to prevent prejudicial occurrences and to determine the effect of such occurrences when they happen." Smith v. Phillips, 455 U.S. 209, 217 (1982). Furthermore, "jurors must not engage in discussions of a case before they have heard both the evidence and the court's legal instructions and have begun formally deliberating as a collective body." See United States v. Cox, 324 F.3d 77, 86 (2d Cir. 2003) (quoting United States v. Resko, 3 F.3d 684, 688 (3d Cir. 1993)). Where the District Court instructs the jury to refrain from premature deliberations, as the Court did in this case, and the jury nevertheless discusses the case prior to the close of trial, that premature

26

deliberation may constitute juror misconduct. Cox, 324 F.3d at 86. The allegation of premature deliberations in this case was exacerbated by the fact that the alternate juror allegedly said that jurors had questioned the presumption of innocence for the defendant simply because she was on trial.

Faced with a credible allegation of juror misconduct during trial, a court has an obligation to investigate and, if necessary, correct the problem. United States v. Peterson, 385 F.3d 127, 134 (2d Cir. 2004); Cox, 324 F.3d at 88. The District Court "has broad flexibility in such matters, especially when the alleged prejudice results from statements by the jurors themselves, and not from media publicity or other outside influences." United States v. Thai, 29 F.3d 785, 803 (2d Cir. 1994) (internal quotation marks omitted); see Cox, 324 F.3d at 87. A trial judge's handling of juror misconduct and the Court's findings with respect to a jury's impartiality are reviewed for abuse of discretion. Peterson, 385 F.3d at 134.

In this case, the trial Court abused its discretion by not conducting any inquiry about what the Court acknowledged might well be an accurate allegation of juror misconduct. Defense counsel asked for further investigation and a curative instruction, but the Court denied both requests. Without ever

27

disturbing the jury deliberations, the Court could have asked the alternate juror what exactly was said and by whom, and then made a determination of what, if any, further investigation was required. Only if the preliminary inquiry produced a specific and credible reason to conduct further inquiries would it have been necessary to pursue further measures. See id. at 133-36 (finding that the examination and recusal of an "unbalanced" juror together with satisfactory responses by the remaining jurors as to their impartiality was within the trial court's discretion). The Court abused its discretion by failing to conduct any inquiry to determine if the allegation of juror misconduct was true.

**C.**

The defendant argues that her conviction should be vacated because the Court gave the jury an improper Allen charge. After approximately four hours of deliberations, which resulted in a deadlock note and a modified Allen charge, the jury returned a note seeking clarification of the charges and the instruction on guilt beyond a reasonable doubt. The Court and the parties agreed to dismiss the jury for the weekend and to respond to their questions on Monday morning.

28

The Judge called the jury into the courtroom, read aloud the jury's note, and gave the jury additional instructions. Those instructions included the following language: "I believe that on Monday, after you've had a restful weekend and are given instructions by me, when you retire into the jury deliberation room and you give each other fair and full consideration, you will be able to arrive at a just verdict." (Trial Tr. 692) The Court also told the jury: "you should not feel any pressure of time in reaching your verdict. You should listen to each other's views and work as diligently as you can to arrive at a unanimous verdict." (Trial Tr. 692)

The parties do not dispute that this instruction was a modified <u>Allen</u> charge. The defining characteristic of an <u>Allen</u> charge is that "it asks jurors to reexamine their own views and the views of others." <u>Spears</u>, 459 F.3d at 204 n.3. An <u>Allen</u> charge is unconstitutional if it is coercive in the context and circumstances under which it is given. <u>Id.</u> at 205.

This Court has previously explained the history of the <u>Allen</u> charge:

In <u>Allen</u>, the Supreme Court approved of supplemental instructions given to a deadlocked jury urging them to continue deliberating and for the jurors in the minority to listen to the majority's arguments

29

and ask themselves whether their own views were reasonable under the circumstances. The instructions in Allen included statements directing that "the verdict must be the verdict of each individual juror, and not a mere acquiescence in the conclusion of his fellows," and that it was the jury's duty "to decide the case if they could conscientiously do so." These statements served to remind jurors in the minority that a verdict was not required, and that no juror should surrender the juror's conscientiously held views for the sake of rendering a verdict.

Id. at 204-05.

The original Allen charge has been criticized because it focused on the suggestion that jurors in the minority should reconsider their position. In more recent times, courts have tended to use charges that do not contrast the majority and minority positions, but ask all jurors to re-examine their own views and the views of others. Id. at 204 n.4.

In Spears, this Court accepted the parties' representations that the Judge had given a modified Allen charge and applied the standard developed in Lowenfield v. Phelps, 484 U.S. 231 (1988), to determine whether that charge was coercive. Lowenfield requires the Court to evaluate "the potential coercive effect of a charge to a deadlocked jury . . . in its context and under all the circumstances." Spears, 459 F.3d at 205 (quoting Lowenfield, 484 U.S. at 237)

30

(internal quotation marks omitted); see United States v. Vargas-Cordon, No. 11-5165, 2013 WL 4046274, at *7 (2d Cir. Aug. 12, 2013). This Court observed that "when an Allen charge directs jurors to consider the views of other jurors, specific cautionary language reminding jurors not to abandon their own conscientious beliefs is generally required." Spears, 459 F.3d at 205; see Smalls v. Batista, 191 F.3d 272, 279 (2d Cir. 1999) ("[A] necessary component of any Allen-type charge requires the trial judge to admonish the jurors not to surrender their own conscientiously held beliefs.").

Evaluating the charge in Spears in the circumstances and the context in which it was given, this Court found that the modified Allen charge was not coercive. "The charge asked the jurors to consider the facts 'with an attempt to reach a verdict if that be possible,' and to continue deliberations 'with a view toward arriving at a verdict if that's possible.'" Spears, 459 F.3d at 206. Although the trial court had failed to include the admonition not to give up conscientiously held beliefs, "the charge did not urge the jurors to listen to the views of other jurors with whom they disagreed or attempt to persuade each other," and "the original charge, given to the jury earlier that day, did include

cautionary language telling jurors that they had a right to stick to their arguments and stand up for their own strong opinions." Id. This Court also found it significant that defense counsel did not object to the charge. Id. Moreover, following the Allen charge, the jury continued to deliberate for the rest of the day and ultimately could not reach a verdict with respect to one of the defendants. Id. at 207. This Court reasoned, "[t]his result strongly indicates that individual attention was given to each defendant as to each count, and that the charge did not cause jurors to surrender their opinions merely to reach a result." Id. (quoting United States v. Fermin, 32 F.3d 674, 680 (2d Cir. 1994), overruled on other grounds by Bailey v. United States, 516 U.S. 137 (1995)) (internal quotation marks omitted).

The issue in this case is whether the modified Allen charge given at the end of the day was coercive in the circumstances and context in which it was given. The Court was aware that the jury was deadlocked, and the Court had already given a modified Allen charge. The jury had continued to deliberate and asked for instructions on reasonable doubt and the absence of evidence. Repeating a modified Allen charge at this time, without a request from the jury,

32

could reasonably be perceived by the jurors as the Court communicating its insistence on the jury reaching a unanimous verdict. See United States v. Ruggiero, 928 F.2d 1289, 1299 (2d Cir. 1991) (finding that a repeated Allen charge is not "inevitably" coercive and noting that both instructions included cautionary language counseling jurors not to surrender conscientiously held views); see also United States v. Barone, 114 F.3d 1284, 1305 (1st Cir. 1997) ("[C]aution needs to be used before the modified Allen charge is given for a second time.").

The Allen charge at issue encouraged the jurors to exchange views with one another, consider each other's views, and work diligently to reach a verdict, but did not contain the admonition not to give up conscientiously held beliefs. The charge did more than simply advise jurors to continue their deliberations. Unlike the charge in Spears, the charge in this case did not suggest that failing to reach a unanimous verdict was permissible. To the contrary, the Court stated that it "believe[d]" that the jury would "arrive at a just verdict" on Monday. (Trial Tr. 692)

A reasonable juror could view this instruction as lending the Court's authority to the incorrect and coercive proposition that the only just result was a

33

verdict. However, a verdict is just only if it represents the conscientiously held beliefs of all jurors. Under these circumstances, the Court should have given the balancing, cautionary instruction that no juror should give up conscientiously held beliefs. See Smalls, 191 F.3d at 278.

The failure to give such a cautionary instruction was coercive in these circumstances although there are some factors that argue against concluding that the modified Allen charge given at the end of the day was coercive under all the circumstances: the previous Allen charge had included cautionary language; defense counsel did not find the charge sufficiently coercive to object; and the jury deliberated for about four and a half hours on the following Monday after the weekend break before reaching a verdict. It is unnecessary to decide whether these factors were sufficient to overcome the coercive aspects of the modified Allen charge. The Court should have refrained from giving an unsolicited modified Allen charge or, at the very least, should have included the balancing, cautionary language. The defective charge can be considered in determining the fairness of the trial, particularly given that the jurors expressed difficulty in reaching a unanimous verdict.

**II.**

The defendant argues that her conviction should be vacated because of numerous evidentiary errors. It is only necessary to deal with two such errors that may be relevant on remand. We find that Officer Rabideau's testimony about how the fuel tank functions and Agent Linstad's testimony on the ultimate issue of whether the defendant knew she possessed drugs were erroneously admitted at trial.

**A.**

The defendant argues that the Court admitted the lay opinion testimony of Officer Rabideau regarding how the fuel tank in the rental car functions in violation of Federal Rule of Evidence 701 because that testimony was based on specialized knowledge. The defendant argues that the admission of this testimony prejudiced her because she did not have the opportunity to present a rebuttal expert or to prepare to cross-examine Officer Rabideau on the technical subject of how the fuel tank operates. The testimony was important to the Government's case because it supported the Government's argument that the

fuel gauge must have been showing "empty" throughout the trip from Canada and that the defendant was not being truthful when she explained that she only saw the warning light shortly before reaching the border.

Federal Rule of Evidence 701 limits lay witness testimony to testimony that is "(a) rationally based on the witness's perception; (b) helpful to clearly understanding the witness's testimony or to determining a fact in issue; and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702." Fed. R. Evid. 701. Under Federal Rule of Evidence 701, "lay opinion must be the product of reasoning processes familiar to the average person in everyday life." United States v. Garcia, 413 F.3d 201, 215 (2d Cir. 2005). This rule "prevent[s] a party from conflating expert and lay opinion testimony thereby conferring an aura of expertise on a witness without satisfying the reliability standard for expert testimony set forth in Rule 702 and the pre-trial disclosure requirements set forth in Fed. R. Crim. P. 16 . . . ." Id.

The defendant argues that the testimony at issue was not rationally based on Officer Rabideau's perceptions, but on expert or specialized knowledge. The relevant portion of Officer Rabideau's testimony is as follows:

36

On the outside of this cylinder, there's a float and that's -– the float is what shows that the gas level, so as the float goes down, the gas level in the vehicle obviously goes down. So, when the drugs were placed and the float was pushed to the bottom, drugs holding that to the bottom would always read zero kilometers to empty. That would always be on empty.

(Trial Tr. 287-88) Officer Rabideau also testified that he had not been to "mechanic school," but had "looked in the gas tank prior to this," and that his experience investigating other cars at the border served as a basis for his knowledge of how the fuel tank functions. (Trial Tr. 309)

If the opinion of a witness "rests in any way upon scientific, technical, or other specialized knowledge, its admissibility must be determined by reference to Rule 702, not Rule 701" because "lay opinion must be the product of reasoning processes familiar to the average person in everyday life." Garcia, 413 F.3d at 215 (internal quotation marks and citation omitted). Accordingly, this Court has held that "the foundation requirements of Rule 701 do not permit a law enforcement agent to testify to an opinion so based and formed if the agent's reasoning process depended, in whole or in part, on [the agent's] specialized training and experience." Id. at 216.

Officer Rabideau's testimony was improperly admitted over the defendant's objection because his opinion was based on specialized training and experience. Officer Rabideau did more than simply describe what he found in the gas tank and what he perceived. He described how the float on the outside of the gas tank worked and why the gas gauge would have registered zero to empty while the drugs were in the gas tank. As the Government concedes, this testimony was based on knowledge that Officer Rabideau acquired inspecting other cars at the border. That he did not attend "mechanic school" does not render his testimony admissible under Federal Rule of Evidence 701. Officer Rabideau acquired his knowledge of how a fuel tank operates through his experience as a border agent inspecting vehicles, not through the reasoning processes of the average person. Therefore, the admission of this testimony was error.

**B.**

The defendant argues that it was error to permit Agent Linstad to testify to the ultimate issue of the defendant's knowledge of drugs in the car in violation of

38

Federal Rule of Evidence 704. Federal Rule of Evidence 704(b) provides: "In a criminal case, an expert witness must not state an opinion about whether the defendant did or did not have a mental state or condition that constitutes an element of the crime charged or of a defense. Those matters are for the trier of fact alone." Fed. R. Evid. 704(b). The defendant argues that the admission of Agent Linstad's testimony that the defendant "realized" narcotics were in the rental car was improper expert testimony on the ultimate issue of the defendant's knowledge of whether there were drugs in the rental car, which was a critical element of the charges against the defendant. (Trial Tr. 589)

It is well established that Rule 704(b) "disables even an expert from expressly stating the final conclusion or inference as to a defendant's actual mental state at the time of a crime." United States v. DiDomenico, 985 F.2d 1159, 1164 (2d Cir. 1993) (internal quotation marks and citations omitted). Such testimony is prohibited because it "poses a uniquely heightened danger of intruding on the jury's function." Id.; see id. at 1164-65 (collecting cases).

Agent Linstad's testimony regarding whether the defendant "realized" that there were drugs in the car was erroneously admitted because it is expert

39

testimony about the defendant's state of mind. Indeed, whether the defendant "realized" that there were drugs in the car was the key issue in this case. Moreover, Agent Linstad used the opportunity to summarize some of the Government's evidence as to why the defendant must have known that she was transporting drugs, which included the defendant's inconsistent statements, the strong odor of gasoline, the fuel light, and the presence of masking agents. The Court had previously warned the parties that it would not permit such testimony about the defendant's knowledge, but when it was actually introduced, the Court erroneously failed to strike it. The admission of this testimony at trial was plain error. See United States v. Dukagjini, 326 F.3d 45, 55 (2d Cir. 2002) (finding error where a case agent certified as an expert "acted at times as a summary prosecution witness[, with] the effect [of] . . . bolstering . . . the testimony" of other witnesses and "impinging upon the exclusive function of the jury").

**III.**

The defendant argues that her conviction should be reversed because her counsel provided constitutionally ineffective assistance at trial. To succeed on an

ineffective assistance of counsel claim, a defendant must demonstrate that counsel's choices were not strategic because they "were outside the wide range of professionally competent assistance," and "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 690, 694 (1984). However, a cold trial record usually "will not disclose the facts necessary to decide either prong of the Strickland analysis." Massaro v. United States, 538 U.S. 500, 505 (2003). Therefore, "in most cases a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective assistance." Id. at 504.

When a defendant raises a claim of ineffective assistance of trial counsel, this Court may (i) decline to hear the claim and permit the defendant to raise the claim as part of a subsequent motion filed pursuant to 28 U.S.C. § 2555; (ii) remand the claim to the District Court for fact-finding; or (iii) decide the claim based on the record before it. United States v. Doe, 365 F.3d 150, 152 (2d Cir. 2004). In this case, it is unnecessary to reach the merits of the ineffective assistance of counsel claim because the conviction must be vacated on other

41

grounds. Moreover, because the conviction is being vacated there will be no occasion for a section 2255 motion. Therefore, we decline to reach the defendant's claim of ineffective assistance of trial counsel.

**IV.**

This trial was marred by significant errors, including: trying the defendant in shackles without a finding of necessity on the record; failing to investigate alleged juror misconduct; and providing an improper <u>Allen</u> charge to the jury. There were also serious evidentiary errors, in particular the improper admission of lay opinion testimony and the failure to strike expert testimony regarding the defendant's realization that there were drugs in her rental car. These errors occurred in the context of a short trial in which the evidence was introduced in less than three days. This was a close case that prompted approximately eight hours of jury deliberations and a jury note asking for help because the jury was hopelessly deadlocked. It was only after the Judge instructed the jury that the Court "believe[d]" that they would reach a verdict that the jury did just that.

Individually, these errors may not provide a basis for vacating the defendant's conviction.  However, when considered together, in the context of this trial, these errors call into serious doubt whether the defendant received the due process guarantee of fundamental fairness to which she and all criminal defendants are entitled.  See Taylor v. Kentucky, 436 U.S. 478, 487 n.15 (1978); see, e.g., United States v. Al-Moayad, 545 F.3d 139, 178 (2d Cir. 2008); United States v. Guglielmini, 384 F.2d 602, 607 (2d Cir. 1967).  Therefore, we **VACATE** the judgment of the District Court and **REMAND** for proceedings consistent with this opinion.

## **CONCLUSION**

We have considered all of the arguments of the parties.  To the extent not specifically addressed above, they are moot.  For the reasons explained above, we **VACATE** the judgment of the District Court and **REMAND** for proceedings consistent with this opinion.

43